**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**JODI DARLENE DODSON**,

       **Petitioner,**

   **v.**
                                          **Civil action no. 1:10cv4**
                                                 **Criminal action no. 1:08cr53**
                                                 **(Judge Keeley)**

**UNITED STATES OF AMERICA**,

       **Respondent.**

**REPORT AND RECOMMENDATION
THAT §2255 MOTION BE DENIED**

**I. Introduction**

On January 8, 2010, through counsel, petitioner filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody[1] without a memorandum in support. After an unopposed motion for an extension of time[2] in which to respond was granted by Order[3] entered on February 10, 2010, the Government filed its response on March 8, 2010.[4] Petitioner did not file a reply to the Government's response through counsel. However, on April 6, 2010, petitioner filed an untimely, unsigned 58-page *pro se* reply,[5] along with a Motion to Quash Search Warrant and Suppress Fruits of Search Seeking to Engage in Civil Discovery to Aid Attack

---

[1] Dkt.# 201.

[2] Dkt.# 204

[3] Dkt.# 205

[4] Dkt.# 207. The Government's response included a motion to dismiss.

[5] Dkt.# 213.

1

on the Search Warrant: Dismissal of Indictment[6] (Dkt.# 209), and a Motion for Release Pending Appeal[7] [sic] (Dkt.# 211).

## II. Facts

### A. Conviction and Sentence

On October 7, 2008, petitioner signed a plea agreement, agreeing to plead guilty to Count 49 of a 56-count indictment,[8] possession or distribution of pseudoephedrine, a List I chemical, knowing, or having reasonable cause to believe, that the listed chemical would be used to manufacture a mixture or substance containing a detectable amount of methamphetamine, in violation of Title 21, U.S.C. § 841(c)(2).[9] The maximum penalty for the offense being pled to was specified as not more than twenty (20) years imprisonment, a fine of not more than $250,000.00, and a period of supervised release of three (3) years. (Id.). The parties stipulated and agreed that petitioner's total drug relevant conduct was at least 10G but less than 40G of pseudoephedrine. (Id. ¶ 9 at 3). In the plea agreement, the petitioner waived her right to appeal and to collaterally attack her sentence. Specifically, the agreement states:

> 12. The above paragraphs not withstanding, the defendant will retain her appellate rights and rights to collaterally attack her sentence only with respect to any sentence imposed using a base offense level 27 or higher. This reservation of rights is designed to ensure that the United States and the defendant retain the benefits of the plea agreement. It is not intended to represent the defendant's estimation of what an

---

[6] The Government responded on April 8, 2010. (Dkt.# 215). In reply, on May 3, 2010, petitioner filed an unsigned *pro se* Petitioners" [sic] Response to Government Regarding Motion to Quash Search Warrant and Suppress Fruits of Search Seeking to Engage in Civil Discovery to Aid Attack on the Search Warrant: Dismissal of Indictment. (Dkt.# 222).

[7] The Government responded on April 8, 2010. (Dkt.# 216). In reply, on May 3, 2010, petitioner filed an unsigned *pro se* Petitioners' [sic] Response to Opposition by United States Government Regarding Motion for Release Pending Appeal [sic]. (Dkt.# 221).

[8] The other 11 counts petitioner was charged with were dismissed as part of the plea agreement.

[9] Dkt.# 104 at 1.

appropriate or reasonable sentence would or should be. Nor does this reservation of rights prevent the defendant from arguing for a sentence below the aforementioned adjusted Guideline offense levels. The United States will retain the right to appeal any sentence imposed.

(Id. at 4).

On October 8, 2008, the petitioner, then aged 39 and having earned an Associates Degree in Office Administration, entered her plea in open court. (Dkt.# 148 at 9). During the plea hearing, the Assistant U.S. Attorney ("AUSA") read aloud or summarized in open court each paragraph of the plea agreement, including the paragraph 12 *supra*. (Id. at 19 - 26). The Court then asked petitioner whether the AUSA's summary of the plea agreement reflected her understanding of the terms of her plea agreement with the Government, and petitioner stated that it did. (Id. at 26). The Court specifically asked petitioner if she understood the waiver of her appellate and collateral attack rights and petitioner said that she did. (Id. at 37 - 39 and 44). The Court then asked petitioner if she and her counsel had had an opportunity to discuss the appellate and habeas corpus rights that she was waiving by entering a plea, and petitioner said that they had. (Id. at 40 - 45). The Court inquired of petitioner's counsel whether he believed that petitioner understood what she was doing by entering the plea, and counsel said that he believed that petitioner did. (Id. at 48). The Court informed petitioner that the maximum sentence for the crime which she was pleading could be no more than twenty years imprisonment (Id. at 29 - 30), but that the ultimate sentence could be greater than that estimated by counsel; petitioner indicated that she understood. (Id. at 40). The Court specifically asked petitioner whether she understood that the length of her sentence could not be determined by anyone until the pre-sentence report ("PSR") was completed and petitioner said "[y]es." (Id. at 56). The Court summarized the rights that petitioner was giving up by pleading guilty. (Id. at 41 - 44). During the plea hearing, the Government presented the testimony of Corporal Dennis Cayton of the

West Virginia State Police to establish the factual basis for the plea. (Id. at 49 - 54). Petitioner did not contest the factual basis for the plea.

After the factual basis for the plea was presented, the Court asked petitioner if she was, in fact, guilty of the charge and petitioner advised the Court that she was. (Id. at 55). The Court then asked petitioner if her lawyer had done a good job representing her and she responded "[y]es." (Id. at 58). The Court further asked petitioner whether she thought that there was any thing she thought that her lawyer left undone, or anything that she thought her lawyer did improperly, and petitioner stated "[n]o." (Id.). At the conclusion of the hearing, the Court determined that petitioner was competent, that she had made her plea freely and voluntarily with full understanding of its consequences, and that the elements of the crime in Count 49 had been proven beyond a reasonable doubt. (Id. at 60). Petitioner did not object to the Court's finding.

On January 9, 2009, petitioner appeared before the court for sentencing. Petitioner was found to have a base and adjusted offense level of 26. After a two-level reduction for acceptance of responsibility and an additional one-level reduction were granted, petitioner had a total offense level of 23. (Dkt.# 203 at 10 - 11). Petitioner's criminal history level was a I. The Court found that the sentence guideline range was 46 - 75 months imprisonment. (Id.). Petitioner declined the opportunity to allocute. (Id. at 18). Although defense counsel filed no objections to the PSR, he argued for variances for acceptance of responsibility and for a safety valve, including consideration of alternative sentencing instead of incarceration, issues briefed in his sentencing memorandum. (Id. at 19 - 20). The Government opposed the safety valve variance, arguing that petitioner had not been completely truthful and forthcoming with all the information about the methamphetamine conspiracy. (Id. at 20 - 22). After defense counsel rebutted, the Court ruled against the variance, finding that it

was not warranted. The Court noted that petitioner's limited version of the offense "just barely makes it as an admission in this case" and that petitioner's position that most of the materials found incident to the search were being used to treat her Lyme's disease "strains my credulity." (Id. at 27).

Taking all necessary information into consideration, the Court sentenced petitioner to 46 months imprisonment, the lowest end of the guideline (Id. at 29 and 33), a term of three years supervised release. The Court took the issue of restitution under advisement.[10] (Id. at 33). The Court again explained petitioner's waiver of her appellate and habeas corpus rights to her, advising her of the process for filing a notice of appeal in *forma pauperis* if she felt she had a basis for doing so. (Id. at 35).

## B.    Direct Appeal

Petitioner did not file a direct appeal.

## C.    Federal Habeas Corpus

### Petitioner's Contentions (Dkt.# 201)

Petitioner raises two grounds in her § 2255 motion:

1)      Ineffective assistance of counsel; and

2)      petitioner's guilty plea was coerced by counsel.

### Government's Response (Dkt.# 207)

The Government contends that petitioner knowingly and voluntarily waived her right to bring a § 2255 motion. Further, petitioner's Rule 11 colloquy testimony refutes her claim that her plea was coerced or that her counsel failed to: keep her informed; timely provide her with the Government's

---

[10] The Court later ruled that restitution was not applicable.

evidence; properly investigate her case; or consider her claims of innocence.  Petitioner has failed

in her burden under <u>Strickland</u> and her claims should be dismissed.

**Petitioner's *pro se* Reply[11] (Dkt.# 213 and 213-1)**

Petitioner contends that

1) the search warrant was invalid  because it was based upon the affiant's knowing, intentional and/or reckless disregard for the truth, and included false statements;

2) she was falsely arrested based on false information, because the probable cause for the search warrant was based upon "altered and fraudulent documents." (<u>Id</u>. at 10); and

3) the indictment was defective.

4) The Government breached the plea agreement by failing to ask her for substantial assistance, thereby giving her an opportunity to earn a downward departure, and by "supporting the information in the PSI [sic], which . . . [petitioner] contested."  (<u>Id</u>. at 42).

5) The prosecution was malicious because:

      a) the investigating officer altered state documents to gain probable cause for the search warrant;

      b) the investigating officer committed identity theft and fraud to create the charges against her;

      c) the investigating officer "altered not only my husbands [sic] board of pharmacy report, but mine as well," (<u>Id</u>. at 23);

      d) the investigating officer perjured himself on the stand at the plea hearing, (<u>Id</u>. at 37);

      e) the investigating officer knowingly submitted false information to the probation officer;

      f) The prosecution and her own attorney "conspired to keep case [sic] out of trial to save Trooper Cayton [the investigating officer] from arrest and conviction[,]" (<u>Id</u>. at 35); and

      g) the Government witness was the parent of petitioner's husband's only business

---

[11] Petitioner's 58-page *pro se* reply was unsigned.

competitor, and therefore had improper motive for testifying against them.

6) The investigating officer illegally shut down petitioner and her husband's business and used unlawful disposal methods to clean up the methamphetamine from their property, endangering their/others' health;

7) The sentencing was illegal because it was based on the weight of items she did not possess.

8) Her 5th and 6th Amendment rights were violated.

9) She is actually innocent and should be permitted to withdraw her plea.

10) The evidence did not support her conviction because the Government did not prove she purchased the pseudoephedrine products by the preponderance of the evidence.

11) Her constitutional rights have been violated, because she was using the pseudoephedrine products "as intended and I can treat my illness as I see fit, according to the American Disabilities Act, and it is not illegal." (Id. at 43).

12) An attorney named G. Cosenza[12] was ineffective for:

a) his pre-indictment behavior in failing to assist petitioner and her husband "in matters regarding this case[,]"[13] (Id. at 46);

b) having a conflict of interest with petitioner, because he represented another client[14] and later recused himself on that basis;

c) compromising petitioner's and her husband's cases because "he knows our case, our evidence, then represented witness[15] [sic] against us[,]" (Id. at 11);

---

[12] "G. Cosenza" has never been counsel of record for petitioner in this matter. George Cosenza was, however, one of the attorneys defending petitioner's husband on charges arising out of the same methamphetamine conspiracy petitioner was involved in. Elsewhere in her reply, petitioner states that Cosenza was "hired to file charges against law officials and to assist with obtaining husbands [sic] business reopening, as it was closed with illegal, fraudulent documents and statements that were presented to state and federal organizations; we have the evidence and witnesses." (Id. at 10).

[13] On another page in her reply, petitioner states that "G. Cosenza was hired for a different matter but did try to discover what was happening and was denied information, therefore denying him and his clients the right to attend the indictment hearing." Dkt.# 213-1 at 54.

[14] Elsewhere, petitioner states that "G. Cosenza" defended "J. Holt" who "illegally dumped and used my husbands [sic] property to dispose of his toxic chemicals, exposing us and our customers, and thegeneral [sic] public to these toxic chemicals, and the property owners, the health department or HAZMAT, allowing us all to be poisoned." Id. at 12.

[15] Elsewhere in her reply, petitioner identifies this other witness as J. Holt. (Id. at 10).

d) unlawfully keeping $15,000 in legal fees petitioner and her husband paid him; and

e) despite knowing of fraud and illegal acts used against petitioner and her husband that led to their being indicted, he allowed it to happen. (Id. at 50).

13) An attorney named W. Dillon[16] was ineffective for

a) not requesting a hearing at which petitioner could have asserted her objections. (Id. at 12);

b) being "unreasonable . . . completely ineffective, present[ing] unacceptable behavior . . . and . . . [being] morally ethically, and legally wrong," (Id. at 13); and

c) despite knowing of fraud and illegal acts used against petitioner and her husband that led to their being indicted, he allowed it to happen. (Id. at 50).

14) Her first court-appointed attorney, K. Sivakurmaran, was ineffective because he:

a) knew of fraud and illegal acts used against petitioner and her husband that led to their being indicted and allowed it to happen, (Id. at 50);

b) did not understand the case;

c) was "unreasonable . . . completely ineffective, presented unacceptable behavior . . . and . . . [was] morally ethically, and legally wrong[,]" (Id. at 13);

d) was "Indian/Arab, with limited english [sic] vocabulary and writing skills[,]" (Id. at 12);

e) was unable to defend her because "this case was too complicated for him[,]" (Id.); and

f) "all he wanted to discuss was a plea." (Id.).

15) Her final attorney, B. Carr, was ineffective for:

a) knowing of fraud and illegal acts used against petitioner and her husband that led to their being indicted, and still allowed it to happen, (Id. at 50);

b) failing to object to the Government's improper motivation in using the Grand Jury;

---

[16] "W. Dillon" has never been counsel of record for petitioner in this matter. The record reveals that Mr. Wells H. Dillon was one of the attorneys representing petitioner's husband on charges arising out of the methemphetamine conspiracy.

c) failing to reveal the "concrete evidence" of Government misconduct to the Court;

d) refusing to obtain transcripts for her;

e) breaching attorney-client confidentiality;

f) participating in a fraudulent cover-up with the investigating officer, (Id. at 23);

g) obstructing justice, suborning or attempting to suborn perjury;

h) refusing to file a civil lawsuit to expose the "fraud in state or federal courts," by revealing the illegal acts committed by those involved in the malicious prosecution of petitioner and her husband, (Id. at 37);

i) failing to properly investigate the case or interview witnesses;

j) not preparing for trial and having no trial strategy;

k) being "unreasonable . . . completely ineffective, present[ing] unacceptable behavior . . . and . . . [being] morally ethically, and legally wrong[,]" (Id. at 13).

l) reneging on promises to present witnesses, including physicians, on her behalf;

m) denying her due process;

n) failing to attend one preliminary hearing, or alternatively, "to conduct hearings nor [sic] attend[,]" (Id. at 12);

o) never discussing or explaining the plea agreement or relevant conduct to her;

p) lying to her, threatening her that she "would go to prison for the rest of . . . [her] life, that . . . [she] would go to prison that day with no questions asked[,]" (Id. at 39), and/or mentally and verbally abusing her, in order to coerce her plea;

q) having a conflict of interest with the Trooper investigating her case;

r) having a conflict of interest with other attorneys;[17]

s) failing to request a continuance when he was appointed to replace her previous attorney, because of the "complex nature of the case and being in the middle of proceedings," (Id.); and

---

[17] Petitioner alleges conflicts of interest with attorneys "G. Cosenza" and "W. Dillon," neither of whom, the record reveals, ever represented her. (Dkt.# 213-1 at 10).

t) permitting perjured testimony by the investigating officer at the plea hearing and refusing repeatedly to object when petitioner instructed him to do so. (Id. at 45).

u) After the plea hearing, counsel was ineffective for never reviewing the PSR; refusing to take her calls regarding it and/or refusing to file her/her husband's objections to it.

v) At sentencing, counsel was ineffective for: refusing to let her challenge remarks that were made, by telling her to "say nothing, shut up, to keep my mouth shut[,]" (Id.); and

w) not filing a motion[18] for her within ten days after sentencing; and not returning her calls about it until one day before the motion was due, at which time his secretary finally called and petitioner instructed her to tell him "not to bother as he was fired" (Id. at 9);

16) An attorney or attorneys at United Defense Group[19] were ineffective because

a) they knew of fraud and illegal acts being used against petitioner and her husband that led to their being indicted, and allowed it to happen. (Id. at 50).

17) Attorney Elgine McCardle[20] was ineffective for

a) knowing of fraud and illegal acts being used against petitioner and her husband that led to their being indicted, and allowed it to happen. (Id.).

As relief, petitioner requests that:

1) an evidentiary hearing be granted, to challenge the prosecution's opposing the grant of the downward departure and the safety valve reduction by the judge;

2) if her request, *supra,* for an evidentiary hearing is granted, she requests "the reassignment of [sic] sentencing judge, since statements by judge at sentencing exhibited some potential bias against

---

[18] Elsewhere in her reply, petitioner refers to this incident as "[s]upposedly, their [sic] was a motion or an appeal to be filed within [sic] ten days of sentencing and he did not do." (Id. at 45).

[19] Petitioner provides no information as to who the attorney(s) from this group are or any specifics as to what they did or failed to do, and the record does not reveal any involvement by any attorney from United Defense Group on petitioner's behalf.

[20] The record reveals that Ms. McCardle was one of the attorneys who represented petitioner's husband on his methamphetamine charges. She is also petitioner's retained counsel in this habeas corpus action.

granting the downward departure and safety valve[,]" (Id. at 20);

3) that her plea be vacated and her "sentence be remanded;"

4) upon the "remand" of her sentence, she would like the challenge the basis for sentencing;

5) that the evidence be reviewed, to determine what action to take regarding the "malicious investigation" and "malicious prosecution;"

6) a motion to quash the search warrant be granted;

7) a motion seeking to engage in civil discovery to aid attack on the search warrant be granted;

8) that the indictment be dismissed; and

9) that her motion for release pending hearing and her husband's "appeal" [sic] be granted.

**D.      Recommendation**

Based upon a review of the record, the undersigned recommends that petitioner's § 2255 motion be denied and dismissed from the docket because petitioner knowingly, intelligently, and voluntarily waived the right to collaterally attack her conviction.  Further, petitioner's claims of ineffective assistance of counsel after the entry of the plea have no support in either fact or law.

### III.  Analysis

**A.      Burden of Proof**

"A petitioner collaterally attacking his sentence or conviction bears the burden of proving that his sentence or conviction was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack.  28 U.S.C. § 2255.  A motion collaterally attacking a petitioner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence."  Sutton v. United States

of America, 2006 WL 36859 *2 (E.D.Va Jan. 4, 2006).

**A.  Waiver**

"[T]he guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system.  Properly administered, they can benefit all concerned." Blackledge v. Allison, 431 U.S. 63, 71 (1977).  However, the advantages of plea bargains "can be secure . . . only if dispositions by guilty plea are accorded a great measure of finality." Id.  "To this end, the Government often secures waivers of appellate rights from criminal defendants as part of their plea agreement."  United States v. Lemaster, 403 F.3d 216, 220 (4th Cir. 2005).

In United States v. Attar, 38 F.3d 727, 731 (4th Cir. 1994), the Fourth Circuit found that "a waiver-of-appeal-rights provision in a valid plea agreement is enforceable against the defendant so long as it is the result of a knowing and intelligent decision to forgo the right to appeal."  The Fourth Circuit then found that whether a waiver is knowing and intelligent "depends upon the particular facts and circumstances surrounding [its making], including the background, experience, and conduct of the accused."  Id.  After upholding the general validity of a waiver-of-appeal-rights provision, the Fourth Circuit noted that even with a waiver-of-appeals-rights provision, a defendant may obtain appellate review of certain limited grounds.  Id. at 732.  For example, the Court noted that a defendant "could not be said to have waived her right to appellate review of a sentence imposed in excess of the maximum penalty provided by statute or based on a constitutionally impermissible factor such as race."  Id.  Nor did the Court believe that a defendant "can fairly be said to have waived his right to appeal his sentence on the ground that the proceedings following the entry of the guilty plea were conducted in violation of the Sixth Amendment right to counsel."  Id.

Subsequently, in Lemaster, the Fourth Circuit saw no reason to distinguish between waivers

of direct appeal rights and waivers of collateral attack rights.  <u>Lemaster</u>, 403 F.3d at 220.  Therefore, like the waiver-of-appeal-rights provision, the Court found that the waiver of the right to collaterally attack a sentence is valid as long as it is knowing and voluntary.  <u>Id.</u>  And, although the Court expressly declined to address whether the same exceptions apply since Lemaster failed to make such an argument, the court stressed that it "saw no reason to distinguish between waivers of direct-appeal rights and waivers of collateral-attack rights."  <u>Id.</u> at n. 2.

Based on these cases, it appears that ineffective assistance of counsel claims are barred by a valid waiver, to the extent that the facts giving rise to the claims occurred prior to the defendant entering his guilty plea.  Only claims arising after the entry of the guilty plea may fall outside the scope of the waiver.  <u>Attar</u>, 38 F.3d at 732 [holding it cannot be fairly said that a defendant "waived his right to appeal his sentence on the ground that the proceedings following entry of the guilty plea were conducted in violation of the Sixth Amendment right to counsel, for a defendant's agreement to waive appellate review of his sentence is implicitly conditioned on the assumption that the proceedings following entry of the plea will be conducted in accordance with constitutional limitations"].

Therefore, when reviewing an ineffective assistance of counsel claim in a case where there is a waiver of collateral-attack rights in a plea agreement, we must first determine whether there is valid waiver.  In doing so,

> The validity of an appeal waiver depends on whether the defendant knowingly and intelligently agreed to waive the right to appeal. Although this determination is often made based on adequacy of the plea colloquy -- specifically, whether the district court questioned the defendant about the appeal waiver – the issue ultimately is evaluated by reference to the totality of the circumstances. Thus, the determination must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.

United States v. Blick, 408 F.3d 162, 169 (4th Cir. 2005) (internal citations and quotations omitted).

In other words, the Court must examine the actual waiver provision, the plea agreement as a whole, the plea colloquy, and the defendant's ability to understand the proceedings. Id. If the Court finds that the waiver is valid, any IAC claims arising prior to the plea agreement are barred by the waiver.

As to any IAC claims made regarding an attorney's action, or lack thereof, after the plea agreement, the Fourth Circuit has stated the right to challenge a sentence on the ground that "the proceedings following entry of the guilty plea – including both the sentencing hearing itself and the presentation of the motion to withdraw their pleas – were conducted in violation of their Sixth Amendment right to counsel" are not waived by a general waiver of appeal rights contained in the plea agreement. Attar, 38 F.3d at 732-33. Therefore, upon first blush it appears that IAC claims arising after the guilty plea and/or during sentencing are not barred by a general waiver-of appeal rights.

Several courts have distinguished IAC claims raised in a § 2255 case from those raised on direct appeal. In Braxton v. United States, 358 F. Supp. 2d 497 (W.D.Va. 2005), the Court noted that although the Fourth Circuit has yet to define the scope of waiver of collateral rights, several courts have held that § 2255 waivers should be subject to the same conditions and exceptions applicable to waivers of the right to file a direct appeal. Braxton at 502 (citing United States v. Cannady, 283 F.3d 641,645 n. 3 (4th Cir. 2000) (collecting cases); Butler v. United States, 173 F. Supp. 2d 489, 493 (E.D.Va. 2001)). Nonetheless, the Court distinguished the types of IAC claims available on direct appeal from those available in a § 2255 motion. Specifically, the Court noted:

> Appellate courts rarely hear ineffective assistance of counsel claims on direct review. Indeed, '[i]t is well settled that a claim of ineffective assistance should be raised in a 28 U.S.C. § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance.' United States v. King, 119 F.3d 290,

295 (4th Cir. 1997). Therefore, the waiver exception recognized in <u>Attar</u> applies only to a very narrow category of cases. In contrast, a rule that defendants are unable to waive their right to bring an ineffective assistance claim in a § 2255 would create a large exception to the scope of § 2255 waivers. In fact, such an exception would render all such waivers virtually meaningless because most habeas challenges can be pressed into the mold of a Sixth Amendment claim on collateral review. The Fifth Circuit has recognized this dynamic by noting that '[i]f all ineffective assistance of counsel claims were immune from waiver, any complaint about process could be brought in a collateral attack by merely challenging the attorney's failure to achieve the desired result. A knowing and intelligent waiver should not be so easily evaded.' <u>United States v. White</u>, 307 F.3d 336, 344 (5th Cir. 2002).

<u>Braxton</u>, 358 F. Supp. 2d at 503.

The Court in <u>Braxton</u> further noted that the Tenth Circuit has also distinguished collateral-attack waivers from the situation in <u>Attar</u> and that the Fourth Circuit's holding in <u>United States v. Broughton-Jones</u>, 71 F.3d 1143,1147 (4th Cir. 1995) also supports such a distinction. <u>Braxton</u>, 358 F. Supp. 2d at 503, n. 2. Finally, the <u>Braxton</u> Court found it persuasive that the majority of circuits to have confronted this question "have held that collateral attacks claiming ineffective assistance of counsel that do not call into question the validity of the plea or the § 2255 waiver itself, or do not relate directly to the plea agreement or the waiver, are waivable." <u>Id.</u> at 503. (collecting cases).

The unpublished *per curiam* decision in <u>United States v. Morris</u>, 247 Fed. Appx. 459; 2007 U.S. App. LEXIS 21976 (2007) indicates that when the district court conducts a thorough Rule 11 colloquy and the defendant specifically mentions he waives the right to appeal any sentence below the statutory maximum, the record established that defendant made a knowing and voluntary waiver of rights. Similarly here, during the Rule 11 colloquy, the Court specifically inquired whether petitioner understood the waiver of her appellate and post-conviction habeas corpus relief rights contained in the plea agreement and petitioner said that she did. (Dkt.# 148 at 36 - 39). Further, petitioner specifically testified that she understood that, incident to her plea agreement, the maximum term of

imprisonment that she could receive was twenty years (Id. at 30), and that she was waiving her right to appeal her sentence or to collaterally attack it, if she were sentenced to base offense level of 26 or lower.  (Id.). Her base offense level was 26. (Dkt.# 203 at 35).  The undersigned finds that the only reasonable conclusion from this inquiry is that  petitioner knowingly and voluntarily waived the right to collaterally attack her sentence and to file this § 2255 motion, thus precluding a review of the merits of most of its many claims.[21]  However, since petitioner has also alleged that counsel was ineffective after the entry of the guilty plea, only those three claims will be given review.[22]

**B.** **Ground Fifteen (u): Whether Counsel was Ineffective for Never Reviewing Petitioner's PSR, Refusing Her Calls Regarding it and Refusing to File her Objections to It.**

Petitioner alleges that counsel "never reviewed [the] PSR, to this day." (Dkt.# 213-1 at 5).  Further, she contends that once the probation officer disclosed the PSR to her, counsel "refused to take our calls or file our objections."  (Dkt.# 213-1 at 23).

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance.  The first prong of the test requires that the

---

[21] Most of petitioner's many claims were raised in an *unsigned*, rambling, 52-page *pro se* reply.  Fed. R. Civ. Pro. 11(a) states: "**Every pleading, written motion and other paper must be signed** by at least one attorney of record in the attorney's name – or **by a party personally if the party is unrepresented**.  **The paper must state the signer's address, email address, and telephone number.**  Unless a rule of statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit.  The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention."  Although petitioner's *pro se* reply to the Government's response was unsigned and grossly exceeded the 15-page limit prescribed by LR PL P 11.3, the undersigned will still address the few claims it makes that fall outside of the waiver.

[22] Petitioner's allegations of ineffective assistance of counsel ("IAC") against Attorneys Cosenza, Dillon, Sivakumaran, United Defense Group and McCardle will not be considered.  Attorneys Cosenza, Dillon, McCardle and any attorney(s) from United Defense Group were never counsel of record for petitioner.  Since they never had any duty to defend her, they cannot be found ineffective for failing to do so. Attorney Sivakumaran's representation of petitioner ended well before her plea was entered; thus any claim petitioner might raise against him falls squarely within her waiver of her collateral attack rights.  The only IAC claims that will be considered are the post-plea IAC claims against attorney B. Carr, who represented petitioner before, during and after her plea and sentencing hearings.

petitioner demonstrate that counsel's performance was deficient and "fell below an objective standard of reasonableness." Strickland at 688. The second prong requires the petitioner to show that the deficient performance prejudiced the defense. Id. at 687. In order to satisfy the prejudice requirement of the two-prong test set forth in Strickland, defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Lockhart v. Fretwell, 506 U.S. 364 (1993).

In addition, "a defendant who alleges ineffective assistance of counsel following the entry of a guilty plea has an even higher burden to meet." Hill v. Lockhart, 474 U.S. 52, 53-59 (1985). In the case of a guilty plea, the defendant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985) (footnote omitted); Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland 466 U.S. at 694.

It is further noted that a Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. Strickland 466 U.S. at 689-90. Moreover, there are no absolute rules in determining what is reasonable performance. See Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir. 1995) (counsel's representation is viewed on the facts of a particular case and at the time of counsel's conduct).

Here, petitioner contends that counsel failed to review the PSR at all, and, by inference, failed to review it with her, since she also alleges that the concept of "'relevant conduct' was never explained to her "and I was unaware of the meaning, until after sentencing." (Dkt.# 213-1 at 3). She also contends that once the probation officer disclosed the PSR to her, counsel refused to take her calls or

file any of the "binder full" of objections to it that she wanted made, that she "argued with" him to file, "and he refused." (Id. at 28 and 37).  Further, she asserts, if only counsel had challenged the evidence in the PSR, an evidentiary hearing would have found "sufficient basis for concluding the case" based on  the "fraudulent documents" comprising the evidence summarized in the PSR, submitted by the investigator, all countenenced by her attorney(s), the Government, and the witnesses in her "malicious prosecution."

Petitioner provides no proof to support her own contradictory allegations that counsel "never" reviewed the PSR, either for his own elucidation or to explain it to her.  The record does not support this claim:

> THE COURT: Are you the same Jodi Darlene Dodson who pled guilty on October 8th of last year to Count 49 of the 56 Count Indictment?
>
> THE DEFENDANT: Yes.
>
> [THE COURT:] And are you aware that at that time I accepted your plea but I deferred or put off full acceptance of your plea agreement until today's hearing so that I could take up any disputed issues that could have an impact on the length of your sentence?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Okay. **Now there have been no objections filed with regard to the information in the presentence report**. I have received numerous letters, primarily from family but also from friends in the community, as well as your landlord from the bar concerning the circumstances of this case.  **So I just want you to know that I did read those and I'm prepared to go forward if there are no preliminary matters to address.**
>
> . . .  [Discussion of the application of the safety valve to petitioner's case]
>
> **THE COURT: . . . Okay.  Now, Ms. Dodson, you understand what we've been talking about?**
>
> **THE DEFENDANT: Yes.**
>
> **THE COURT: The Government's position is that you're not entitled to a variance**

**from the guideline sentence in this case of two levels because you have not been forthright and truthful in your debriefing. They wrote that in their memo as well. Did you see the Government's memo?**

**THE DEFENDANT: I don't know.**

**THE COURT: Your defendant's statement [in the PSR] here - -**

**THE DEFENDANT: Yeah, okay.**

**THE COURT: Okay. You understand the circumstances then. Okay? You know what I'm talking about?**

**THE DEFENDANT: Yeah.**

**THE COURT: It has an impact on your sentence.**

**THE DEFENDANT: Yeah.**

THE COURT: All right. **So on page ten at paragraph 33 [of the PSR]** what you say is: "I bought Sudafed pills that had pseudoephedrine in them that I allowed Gale Campbell to have access to. I had reason to believe that he may use some of these pills", [sic] is what I think it means there, "to make methamphetamine. I am deeply embarrassed by my involvement in this case." Of course, the Government's position is that your involvement was much deeper than you acknowledge. All right?

Now, I just want you to know that up until the time I sentence you today you have the right and the opportunity to allocute to the full extent of the circumstances of the offense, which is more than acceptance of responsibility, but the difference is a swing of 37 to 46 months, low end, so if you - - the low end under the advisory guideline range without the two levels would be 46 to 57 months. If there were a variance of two levels from that, then that would be a 37 month low end sentence. **Do you need an opportunity to talk to your attorney or are you ready to proceed?**

**(Pause)**

**THE COURT: Are you ready to proceed?**

**THE DEFENDANT: Uh-huh.**

**MR. CARR: Yes, Your Honor.**

(Dkt.# 203 at 4 - 8)*(emphasis added).*

Clearly, both counsel and petitioner were familiar with the PSR, had discussed it and were still discussing it at the sentencing hearing. Petitioner's own sworn testimony reveals she had had the opportunity to read the PSR and was familiar with it. Furthermore, petitioner's *pro se* reply also contradicts her own claims in this regard. She alleges that before sentencing

> nothing had been asked of me except a memo requesting how I knew the defendants, which was received by my attorney after the due date and was given to me after the due date. **I answered this verbally, my attorney hand wrote the answers and typed it up and submitted it without consulting with me and allowing me to read it.** He leafed thru [sic] it on day [sic] of sentencing and told me he had sent that, along with **the sentencing memorandum for *which I have never read or went over, nor the PSR.***

(Id. at 3)*(emphasis added)*.

As for petitioner's contention that she had a "binder full of objections" to the PSR that she wanted counsel to file and he refused, that claim is refuted by the record as well: at no time in the sentencing hearing did petitioner attempt to raise any objections not raised by counsel; she even declined the opportunity to allocute when it was offered by the Court. (Dkt.# 203 at 18).

Inexplicably, on the same page in her reply, petitioner alleges that the Government "breeched" [sic] the plea agreement "by supporting **the information in the PSR, for which I did contest, but my attorney refused to submit.**" (Id.). She could hardly "contest" the information in the PSR or draft a "binder full" of objections, if she had never been permitted to see it.

Finally, although the record reveals that there were no objections to the PSR filed by either the Government or defense counsel, eleven days before the sentencing hearing, defense counsel did submit an eight-page eloquently-worded sentencing memorandum (Dkt.# 117) on behalf of petitioner. In it, he directly quotes petitioner's base offense level and the guideline range of imprisonment cited in the PSR, in his argument against its consideration as being presumptively reasonable. He stated

[w]ith an adjustment for Acceptance of Responsibility and application of the safety valve, ***which the Probation Officer recommends*** along with the additional one-level reduction for timely acceptance the Total Offense Level is reduced to 21 and with a Criminal History Category of I, the Guideline imprisonment range is 37 to 46 months if relevant conduct is found to be be not less than ten (10) grams nor more than forty (40) grams of pseudoephedrine.

(Id. at 2)*(emphasis added).*

Counsel's memorandum further cited the nature and circumstance of the offense, petitioner's educational, and employment history, personal characteristics, health problems, and her lack of prior criminal history, all of which were set forth in great detail in the PSR. He acknowledged the need for a sentence to reflect the seriousness of the offense, promote respect for the law, deter future criminal conduct and protect the public while still permitting petitioner to continue treatment for her numerous health problems. He emphasized the need to avoid unwarranted sentencing disparities. He argued that petitioner had only had a minor role in the offense and had accepted responsibility. He made motions for departure and/or variance from the Guidelines, pleading for a sentence of home detention or probation.

At the sentencing hearing, counsel vigorously presented his sentencing memorandum argument on petitioner's behalf. He attempted to refute the evidence offered by the Government about the methamphetamine materials found in the trash in the dumpster at petitioner and her husband's bar. Despite counsel's able efforts on petitioner's behalf, the Court declined to impose a sentence of home detention, probation, or to grant the variance, finding that petitioner had been less than credible and forthcoming about her involvement:

THE COURT: Okay. The - - to the extent that the issue before me is whether a variance is warranted in this case, I find that it is not. I think that the presentence report depicts a classic meth conspiracy here and while it's unclear to the Government what part Ms. Dodson played in this, but they think it's larger than she's willing to admit to, it's at least clear to me that she was providing a listed chemical, the pseudoephedrine,

to the process and she admits that in her own plea agreement where she says that she admits she did knowingly and intentionally possess or distribute a listed chemical; that is, pseudoephedrine, knowing or having reasonable cause to believe that the listed chemical will e used to manufacture methamphetamine.

Now I looked carefully at her defendant's version in paragraph 33 of this plea agreement (sic) and I would have to say that it seems that the most Ms. Dodson wants to admit to here is being deeply embarrassed but that she allowed Gale King to have access to, I don't - - I don't know what that's telling me. Did she allow Mr. King to go to her home and take Sudafed pills and she knew about it? And then she says I had reason to believe that he may use some of these pills to make methamphetamine. Really? I was not born yesterday, Ms. Dodson. I frankly feel that your defendant's version just barely makes it as an admission in this case and given what a scourge methamphetamine is in the community where this Court sits, for you to indicate to me that most of this  inform - - this - - these materials were being used to treat your Lyme's Disease strains my credulity. This isn't my first meth case. This is classic and as I said, I think this plea agreement probably was a very good decision on your part because had this been presented to a jury I'd hate to think what a jury would have done with it . . . I just know what I have in front of me and what I have in front of me tells me that for whatever reason you're comfortable with the limited disclosure that you've made . . .  I'm very comfortable saying there's no variance in this case. I don't think that your health conditions, such as they are, are so serious that it warrants a variance from the guideline sentence. I believe that the Bureau of Prisons is going to be perfectly able to manage your health problems in an appropriate fashion while you're incarcerated. I'm well aware that this is your first offense. It is, I think, my sense of your reluctance to be completely candid with the Court about what actually happened in this case that makes me worry that there's a risk of recidivism here that might not otherwise be apparent from your prior criminal history. Meth is a devastating drug. I don't know if you even used meth or if you were just attempting to profit from your involvement in all of this. You have a family that believes in you. You've got a mother, I think, who's sitting back there or it's a relative, I'm not sure who it is - -

MR. CARR: It's her mother-in-law.

THE COURT: Your mother-in-law, who's extremely agitated by what's going on here in the courtroom but the truth of the matter is how that was going to be managed rested with you. People don't just let people use Sudafed a little bit without asking why and when I looked at this you provided fewer pills than your husband and your other co-defendants in this case. So I thought to myself, what's really going on here? I spent time looking at your case and believe that there's a better explanation than the one you've given but the explanation that you've given is the one that I have to live with and I think it - - my conclusion is that the lowest end of the guideline sentence, which - - of the guidelines, which is a sentence of 46 months is an appropriate sentence in this case, given the facts and the background to the case. The actual idea that this sentence

might not have resulted in incarceration was really never realistic. This is - - meth is a - - a meth conviction here is a very serious conviction. It's a terrible drug. I certainly hope you weren't using it, but to the extent that you were enabling others to use it for the purpose of making money, it's reprehensible. Meth is a drug that kills. It doesn't just kill because people are careless and it - - the cooking process explodes, but that does happen. Meth destroys bodies and, you know . . .to the extent that you're a relatively healthy woman, I think you should thank God, because being involved with meth destroys lives; ends lives early in many very bad ways. That's been my experience from the Bench. So that's my reasoning on a sentence at the lowest end of the guideline range that's applicable here of 46 months.

According to the argument that the BOP can't adequately address the defendant's needs, I just disagree with that. It's certainly not a hotel, but I think that the BOP is well able to address the medical needs of Lyme Disease as they present . . . and I don't think the guideline range over-represents the seriousness of the offense, nor do I think it offends sentencing disparity or - - I do think that it would offend sentencing disparity to sentence her to a variant sentence here given the circumstances as I have reviewed them.

So I think this is unfortunate, but I do have to candidly acknowledge she's been given the opportunity and I'm not satisfied that she's taken advantage of it here. The waste was found in her bar's dumpster. That's an important point here. . .

(Dkt.# 203 at 26 - 30).

Petitioner's claim that counsel never "to this day" read the PSR lacks merit. It is immediately obvious from a review of the record that counsel not only read the PSR, but had reviewed it with petitioner, was well versed in what it contained and very well prepared for the sentencing hearing. Further, given the barrage of unsupported, less-than-credible, often-contradictory allegations in petitioner's reply, regarding malicious investigation and prosecution, fraud, altered documents, manufactured evidence, perjured testimony, with conspiracies between the Government, the Court, law enforcement in general and in particular (i.e., the investigating officer), the witnesses, and complicity on the part of every attorney who had ever represented her, (and even some attorneys who did not), it is no wonder that counsel never presented any of her conspiracy theories as objections to the PSR. Counsel is not required to make meritless objections. As such, forgoing making unfounded,

frivolous objections that would not help petitioner's case, and that might actually produce more evidence implicating her, was likely a strategic decision which was not unreasonable under the circumstances. A strategic decision generally will not be second-guessed.  Wiggins v. Corcoran, 288 F.2d 629, 640 (4th Circ. 2002).

Here, petitioner's rambling, repetitive, disjointed 58-page reply, submitted *pro se* while represented by retained counsel,[23] in addition to being unsigned and grossly exceeding the 15-page limit prescribed by the local rules, is a massive laundry list of unsupported, conclusory allegations. Habeas petitions must meet heightened pleading requirements.  McFarland v. Scott, 512 U.S. 849, 856 (1994). The petition must come forward with evidence that the claim has merit.  Nickerson v. Lee, 971 F.2d 1125, 1131 n.8 (4th Cir. 1992), *cert. denied,* 507 U.S. 923 (1993), *abrogation on other grounds recognized,* Yeatts v. Angelone, 166 F.2d 255 (4th Cir. 1999).   Allegations amounting to nothing more than conclusions provide no basis for an evidentiary hearing.

Petitioner entered into the plea agreement  in order to receive the protection of the reciprocal benefits it offered.   The fact that she is incarcerated and unhappy with her situation and now thinks counsel should have made other meritless challenges to the evidence is not evidence of ineffectiveness. Even if it were, the petitioner offers nothing more than conjecture and speculation to show that she was prejudiced by counsel's alleged failures. Her alleged prejudice, by being convicted, failing to receive

---

[23] This Court notes that while the defendant has a Sixth Amendment right to be represented by an attorney, a defendant has no right to act as co-counsel.  United States v. Tarrantino, 846 F.2d 1384, 1420 (D.C. Cir.), cert. denied, 488 U.S. 840 (1988).  Whether to allow a defendant to assume some of his lawyer's functions, that is, to engage in "hybrid representation" is within the sound discretion of the judge.  United States v. LaChance, 817 F.2d 1491 (11th Cir.), cert. denied, 484 U.S. 928 (1987).  Hybrid representation should be permitted only where a defendant has made a showing of some special reason for defendant to act as co-counsel.  United States v. West, 877 F.2d 281 (4th Cir.), cert. denied, 493 U.S. 860 (1989). Issues that counseled parties attempt to raise *pro se* need not be considered except on a direct appeal in which counsel has filed a brief under Anders v. Callifornia, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).  Here, despite having filed a *pro se* reply to the Government's response, along with two other *pro se* motions (Dkt.# 209 and # 211 respectively) while represented by retained counsel, petitioner has made no showing demonstrating any special need, let alone any need at all to act as co-counsel. However, recognizing this court's obligation to construe *pro se* complaints liberally, pursuant to  Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978), this Court is exercising its discretion and considering the limited claims made in petitioner's reply that fall 'outside of' the waiver of her collateral attack rights.

alternative sentencing or to earn the safety valve came from her own decisions to commit the crime and then refuse to be forthright and credible with the Court afterwards, not from anything counsel did or failed to do.  Accordingly, petitioner has failed in her burden under <u>Strickland</u>; relief should be denied.

> **<u>Ground Fifteen (v)</u>: Whether Counsel was Ineffective at the Sentencing Hearing for Refusing to Let Petitioner Challenge Remarks that Were Made.**

Petitioner alleges that at sentencing, counsel instructed her to "say nothing, shut up, to keep my mouth shut." She argues that since counsel refused to object to the PSR and bring the Court's attention to the "inaccurate or unreliable" information contained in it, the Court adopted findings based on unsupported, fraudulent evidence.  She specifically challenges the calculation of total drug relevant conduct amounts that her sentencing was based on, claiming that the Government did not prove the drug amount by the preponderance of the evidence.

Petitioner's claim that the drug weight was erroneously calculated as being higher than it should have been is refuted by the most cursory review of the record.  In ¶ 9 of her plea agreement (Dkt.# 104 at 3), petitioner herself stipulated and agreed to the drug amounts and total drug relevant conduct that she is now disputing:

> 9.  Pursuant to Sections 6B1.4 and 1B1.3 of the Guidelines, the parties hereby stipulate and agree that, on or about February 8, 2008, at or near Clarksburg, Harrison County, West Virginia, defendant Jodi Dodson did knowingly and intentionally possess or distribute a listed chemical, that is, Pseudoephedrine, knowing, or having reasonable cause to believe, that the listed chemical will [sic] be used to manufacture methamphetamine.  The parties further stipulate and agree that the defendant's total relevant conduct is at least 10G but less than 40G of Pseudoephedrine.  The Court is not bound by the above stipulation and is not required to accept the same.  Mrs. Dodson understands and agrees that should the Court not accept the above stipulation, Mrs. Dodson will not have the right to withdraw her plea.

(Dkt.# 104 at 3).

Petitioner signed every page of the plea agreement, including the page on which ¶ 9 appeared. Further, at her plea hearing, she not only failed to object to the Government's witness' detailed testimony

on the amount of drugs, she also *expressly testified she had no additions or corrections to the witness'*
*testimony*. (Dkt.# 148 at 54). Despite petitioner's claim that she tried repeatedly to object at the plea
hearing, (Dkt.# 213-1 at 45), and that she directed counsel to object at sentencing "and he told me over
and over, so no one could hear[,] to shut up. that [sic] he wasn't saying anything and neither was I[,]"
(Id.), the record reflects no outbursts or attempts by petitioner to speak or interrupt counsel, let alone any
action on the part of counsel to prevent her from doing so. Finally, at sentencing, after much discussion
about the drug amount, when the Court noted there were no objections to the PSR, petitioner said nothing.
Further, when specifically offered the opportunity, petitioner declined to allocute. (Dkt.# 203 at 16 - 18).
Petitioner entered no objections to her PSR at all, let alone to the drug amount calculation issue. (Dkt.#
134 at 53).

"When the amount of drugs for which a defendant is to be held responsible is disputed, the district
court must make an independent resolution of the factual issue at sentencing," where "[t]he government
bears the burden of proving by a preponderance of the evidence, the quantity of drugs for which a
defendant should be held accountable." See United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir. 1993)
(citing U.S.S.G. § 6A1.3(b) and United States v. Goff, 907 F.2d 1441, 1444 (4th Cir. 1990)). The
government can meet its burden "by a stipulation of the parties that the court determines to have a
reasonable factual basis." Id. Moreover, the government carries its burden "if a defendant fails to
properly object to a recommended finding in a presentence report . . ." Id.

Petitioner's stipulation and guilty plea were enough for the government to meet its burden of
proof. Because the parties had stipulated to the drug amount, there was no need for counsel to object to
it at sentencing. The drug amount is clearly supported by the record and counsel's decision not to press
for further documentation of drug amounts could only have prejudiced petitioner. Since there was
nothing to object to, counsel cannot be found ineffective for not raising the issue. "Counsel's failure to

file a meritless motion does not constitute ineffective assistance of counsel. See United States v. Wilkes, 20 F.3d 651, 653 (5th Cir. 1994); Almon v. United States, 302 F. Supp. 2d 575, 586 (D.S.C. 2004).

This claim is unsupported by the record. Petitioner has failed to demonstrate that counsel was ineffective and thus has not met her burden of proof. Accordingly, this ground has no merit and should be denied.

**Ground Fifteen (w): Whether Counsel was Ineffective not filing a Notice of Appeal on Petitioner's Behalf**.

Petitioner contends that counsel was ineffective because there was a possible "motion or an appeal" to be filed within ten days of sentencing "and he did not do." (Dkt.# 213-1. at 45).

To demonstrate a Sixth Amendment violation by virtue of counsel's failure to file an appeal, petitioner must first prove that counsel was ineffective, and then, that but for counsel's ineffectiveness, an appeal would have been filed. Roe v. Flores-Ortega, 528 U.S. 470 (2000). "If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." Id. at 478.

The Fourth Circuit Court of Appeals has held that "a criminal defense attorney's failure to file a notice of appeal when requested by his client deprives the defendant of his Sixth Amendment right to the assistance of counsel, notwithstanding that the lost appeal may not have had a reasonable probability of success." United States v. Peak, 992 F.2d 39, 42 (4th Cir. 1993). In rendering this decision, the Court opined:

> Persons convicted in federal district courts have a right to a direct appeal. Coppedge v. United States, 369 U.S. 438, 82 S.Ct.917, 8 L.E.2d 21 (1962). In addition, the Sixth Amendment right to counsel extends to the direct appeal, Douglas v. California, 372 U.S. 353, 83 S.Ct. 917, 8 L. Ed.2d 811 (1963), and it obligates the attorney to file the appeal and identify possible issues for the court even if, in the attorney's opinion, those issues are not meritorious. Anders v. California, 386 U.S.738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

Id. at 41.

Further, the Fourth Circuit maintains that counsel must file an appeal if instructed to, even if appealing would seem contradictory to client's best interest:

> [A]n attorney is required to file a notice of appeal when unequivocally instructed to do so by his client, even if doing so would be contrary to the plea agreement and harmful to the client's interests. In this case, although there is a real possibility that [defendant] will face a higher sentence or even charges related to the [ ] incident if he decides to appeal, his right to appeal cannot be thwarted by attorney error.

United States v. Poindexter, 492 F.3d at 273.

Here, petitioner inadvertently refutes her own claim with regard to whether counsel was instructed to file an appeal. In her *pro se* reply, she alleges that after sentencing, counsel did not return her phone calls about a possible "motion or an appeal" to be filed within ten days of sentencing. (Dkt.# 213-1 at 45). However, elsewhere in her reply she had already admitted that finally, "one day before the motion" was due, (i.e., on the ninth day), counsel's secretary finally called and petitioner instructed her to tell him "not to bother as he was fired." (Id. at 9). Because petitioner's own statements reveal that she had the opportunity to expressly communicate a timely, unequivocal request for an appeal to counsel, but instead told him "not to bother because he was fired," petitioner has disproven her own claim. She has not shown that she requested or instructed counsel to file an appeal and refused or promised and then failed to do so. Accordingly, petitioner has not shown that counsel was ineffective, let alone that but for counsel's ineffectiveness, an appeal would have been filed. Roe v. Flores-Ortega, 528 U.S. 470 (2000). This claim has no merit and should be denied.

## IV.  Recommendation

For the reasons set forth in this opinion, the undersigned recommends that the Court enter an Order **GRANTING** the Government's motion to dismiss, **DENYING** the petitioner's § 2255 motion and **DISMISSING this case with prejudice**.

Further, the undersigned recommends that

1) Petitioner's *pro se* Motion to Quash Search Warrant and Suppress Fruits of Search Seeking to Engage in Civil Discovery to Aid Attack on the Search Warrant: Dismissal of Indictment (Dkt.# 209);

2) Petitioner's *pro se* Motion for Release Pending Appeal [sic] per 18 USCA 3143 (Dkt.# 211);

3) her request for an evidentiary hearing to challenge the prosecution's decision to oppose the grant of a downward departure and safety valve reduction;

4) her contingent request, upon the granting of the evidentiary hearing, for "the reassignment of [the] sentencing judge" for potential bias;

5) her request that her plea be vacated and her "sentence be remanded;"

6) upon the "remand" of her sentence, her request to challenge the basis for sentencing;

7) her request that the evidence be reviewed, to determine what action to take regarding "malicious investigation" and "malicious prosecution;" and

8) her request that the indictment be dismissed **all be DENIED as moot.**

Within **fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. Failure to file timely objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to petitioner's counsel and to all counsel of record both by email and hard copy.

DATED: November 18, 2010

_____

**DAVID J. JOEL**
**UNITED STATES MAGISTRATE JUDGE**